Slip Op. 19-107

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| REBAR TRADE ACTION COALITION,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　　　　Defendant,<br><br>　　and<br><br>COLAKOGLU DIS TICARET A.S. and<br>COLAKOGLU METALURJI A.S.,<br><br>　　　　　　　Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge<br>Court No. 18-00106 |

## <u>OPINION</u>

[The court sustains the determinations of the U.S. Department of Commerce.]

Dated: August 8, 2019

*Maureen E. Thorson*, Wiley Rein LLP, of Washington, D.C., argued for Plaintiff Rebar Trade Action Coalition.  With her on the brief were *John R. Shane* and *Alan H. Price*, Wiley Rein LLP, of Washington, D.C.

*Robert R. Kiepura*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C.; and *Reza Karamloo*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., argued for Defendant.  With them on the brief were *Joseph M. Hunt*, Assistant Attorney General, Civil Division, U.S. Department of Justice; *Jeanne E. Davidson*, Director; and *L. Misha Preheim*, Assistant Director.

*Friederike S. Görgens*, Arent Fox LLP, of Washington, D.C., argued for Defendant-Intervenors Colakoglu Dis Ticaret A.S. and Colakoglu Metalurji A.S.  With her on the brief was *Matthew M. Nolan*, Arent Fox LLP, of Washington, D.C.

This action comes to the court upon a motion by Plaintiff Rebar Trade Action Coalition

("RTAC") under Rule 56.2 of the USCIT Rules, Mot. for J. on the Agency R., ECF No. 22 (Oct.

29, 2018); *see also* Mem. of Pl. in Support of its Mot. for J. on the Agency R., ECF No. 25 (Oct.

30, 2018) ("Pl.'s Br."), appealing from the administrative review of the countervailing duty

("CVD") order on steel concrete reinforcing bar ("rebar") from the Republic of Turkey

("Turkey"), *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 83 Fed. Reg. 16,051

(Dep't Commerce Apr. 13, 2018) (final results and partial rescission) ("Final Results") and

accompanying Issues & Decision Mem., P.R. 205 (Apr. 9, 2018) ("I&D Mem.").  Both the

Government and Defendant-Intervenors Colakoglu Dis Ticaret A.S. and Colakoglu Metalurji

A.S. (collectively "Colakoglu") filed responses to RTAC's motion, asking the court to sustain

the determinations made by the U.S. Department of Commerce ("Commerce" or "the

Department").  Def.'s Resp. to Pl.'s Mot. for J. on the Agency R., ECF No. 34 (Mar. 11, 2019)

("Gov't's Br."); Resp. Br. of Def.-Intervenor in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the

Agency R., ECF No. 35 (Mar. 11, 2019).  Upon consideration of the record, the parties' briefing,

and oral argument, the court finds the Department's determinations to be supported by

substantial evidence and in accordance with law.  Therefore, the court sustains the Final Results

and judgment will enter accordingly.

## BACKGROUND

In November of 2014, the Department of Commerce issued a countervailing duty order

on rebar from Turkey pursuant to 19 U.S.C. § 1671.  *Steel Concrete Reinforcing Bar from the*

*Republic of Turkey*, 79 Fed. Reg. 65,926 (Dep't Commerce Nov. 6, 2014) (CVD order).

Roughly two years later, in response to a notice from Commerce, *Opportunity to Request Admin.*

*Review*, 81 Fed. Reg. 76,920 (Dep't Commerce Nov. 4, 2016), RTAC[1] requested review of the

---

[1] RTAC is made up of the following entities: Nucor Corp.; Gerdau Ameristeel U.S. Inc.;
Commercial Metals Co.; Cascade Steel Rolling Mills, Inc.; Byer Steel Group, Inc.; Bayou Steel
Group; and Steel Dynamics, Inc.  *See* Request for Admin. Review 1 n.1, P.R. 4 (Nov. 30, 2016).

Department's CVD order, Request for Admin. Review, P.R. 4 (Nov. 30, 2016), which in turn

prompted Commerce to initiate a review of Turkish rebar for the period covering January 1, 2015

to December 31, 2015. *Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 82

Fed. Reg. 4,294, 4,297 (Dep't Commerce Jan. 13, 2017).  Involved in that review were

mandatory respondents Colakoglu and Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S.

("Icdas") as well as seventeen other producers and exporters of Turkish rebar.  *Id.*

    In the Department's initial administrative review of the CVD order, Commerce had

determined that Turkish manufacturers of rebar received countervailable subsidies from the

involvement of the Government of Turkey ("GOT") in the market for natural gas.  *See Steel*

*Concrete and Reinforcing Bar from the Republic of Turkey*, 79 Fed. Reg. 54,963 (Dep't

Commerce Sept. 15, 2014) (final affirm. CVD determ.) and accompanying Issues & Decision

Mem. at 8–13 ("Turkey Rebar Final Determ. I").  Subsequent reviews determined that: (a) the

product receiving the subsidy to be natural gas in gaseous form, not liquefied natural gas or

compressed natural gas; and (b) the gaseous form is only transported via pipeline.  *Steel*

*Concrete Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 23,188 (Dep't Commerce

May 22, 2017) (final affirm. CVD determ.) and accompanying Issues & Decision Mem. at 10,

24, and 25 ("Turkey Rebar Final Determ. II").

    In the immediate review, Commerce issued a questionnaire to the GOT.  Countervailing

Duty Questionnaire, P.R. 21 (Feb. 7, 2017).  The questionnaire dedicated several questions to

gathering information about the Turkish government entity that operates the Turkish natural gas

pipeline network, Boru Hatlari Ile Petrol Tasima A.S. ("BOTAS").  *Id.* at 21–24.  One such

question requested "Annual Report(s) pertaining to the POR, and the two preceding years," *id.* at

30, 48, to which the GOT responded by attaching an exhibit containing annual reports for the

years 2013–2015, Questionnaire Resp. of the Gov't of Turkey 11, P.R. 54–87 (Apr. 3, 2017)

("GOT Questionnaire Resp."). Those reports provide general information on the operation of the

pipeline network. In particular, the report from 2015 ("2015 Annual Report"), *id.* ex. 6d,

contains descriptions of specific segments of the pipeline, *id.* ex. 6d at 28–30, as well as a map

titled "Natural Gas and Crude Oil Pipeline System, Natural Gas Supply-Export Contracts"

("BOTAS map"), *id.* ex. 6d at 22–23. The GOT's response also includes information on the

Turkish natural gas pipeline "exit and entry points," which lists entry points numbered 1–9 and

also "Export Exit Point (Greece)." *Id.* at 21–22.

Pursuant to 19 C.F.R. § 351.301(c)(3)(ii),[2] Colakoglu also submitted factual information

for use in calculating a benchmark. Colakoglu's Submission Regarding Natural Gas Benchmark

Pricing Data, P.R. 172–73 (Oct. 27, 2017) ("Colakoglu Benchmark Submission"). Colakoglu

requested, if Commerce were to decline to employ a Tier 1 benchmark, that "the Department

select a [Tier 2] benchmark price which enables it to compare BOTAS prices to a world market

price that would actually be available to Colakoglu." *Id.* at 3. Based on the BOTAS map,

Colakoglu suggested that "Turkey has [a] natural gas pipeline connection with Russia,

Azerbaijan, [and] Iran" and, thus, only those countries could serve as a source price of natural

gas available in Turkey. *Id.* The submission further provided amounts of imported natural gas

organized by source country, concluding that "almost 60% of natural gas [was imported] from

Russia and [a] signification portion of the remaining share came from Iran and Azerbaijan." *Id.*

---

[2] That regulation gives parties the opportunity to provide "factual information to . . . measure the
adequacy of remuneration under [the Tier 2 regulations]" so long as that information is submitted
"no later than 30 days before the scheduled date of the preliminary results of review . . . ." 19
C.F.R. § 351.301(c)(3)(ii).

at 4.  Colakoglu also submitted natural gas prices published by the Romanian Energy Regulatory

Authority ("RERA") and Global Trade Information Services ("GTIS").  *Id.* exs. 5–8.

For its part, RTAC submitted natural gas prices provided by the International Energy

Agency ("IEA") to be used by the Department in calculating the CVD rate.  RTAC Benchmark

Information Submission ex. 6, P.R. 174–177 (Oct. 31, 2017).  Included in the IEA dataset are

natural gas sales prices from a variety of IEA-member states, including several prices from

European countries.  *Id.*

On December 6, 2017, the Department issued its preliminary results.  *See Steel Concrete*

*Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 57,574 (Dep't Commerce Dec. 6,

2017) (prelim. results) and accompanying Prelim. Decision Mem., P.R. 190 (Nov. 30, 2017)

("PDM").  Commerce preliminarily determined that, pursuant to the Department's prior

determinations and due to the continued presence of BOTAS in the market, the price of natural

gas in Turkey is distorted.  PDM at 12–14 (citing, *inter alia*, Turkey Rebar Final Determ. I).  In

calculating the accompanying CVD rate, Commerce rejected Turkish domestic prices as a

benchmark due to BOTAS's prevailing control over the market for natural gas, *id.* at 15, and

instead relied on domestic natural gas prices from Azerbaijan, *id.* at 16.  The Department

determined that the use of Azerbaijani domestic prices as a Tier 2 benchmark was most

appropriate "as that price represents natural gas (a) that would be available through the pipeline

system to purchasers in Turkey and (b) excludes any prices on sales to Turkey itself, *i.e.*, import

prices in Turkey  . . . ."  *Id.* (citing 19 C.F.R. § 351.511(a)(2)(ii)).  In so doing, Commerce

rejected both: (a) the RERA prices and the IEA prices because there ia no pipeline connection

between Turkey and the source countries from which those prices originated, as well as (b) the

Russian and Iranian prices because those figures are either distorted or unavailable in the record.

*Id.* at 15–16.  In order to arrive at the ultimate countervailable benefit, the Department then

"added the per-unit transmission and capacity fees charged by BOTAS to the Azerbaijan annual

price."  *Id.* at 16.

After Commerce released the Preliminary Results, RTAC submitted a case brief arguing

that the Department should rely on data from the IEA instead of the Azerbaijani pricing data.

*See* RTAC's Case Br. & Request for Hr'g, P.R. 198 (Jan. 8, 2018) ("RTAC Case Br.").  At

RTAC's request, Commerce conducted a hearing on the calculation of the CVD rate.  *See* Hr'g

Tr., P.R. 202 (Feb. 16, 2018).

In its Final Results, Commerce adopted the determinations made in the Preliminary

Results over objection from RTAC, *see* RTAC Case Brief.  The Final Results determined that

Colakoglu and Icdas did not receive countervailable subsidies, but that eleven companies who

had not been individually examined had received countervailable subsidies.  Final Results at

16,051–52.  Specifically, as to the CVD calculation, the Department rejected RTAC's arguments

that Azerbaijani prices could not serve a reasonable Tier 2 benchmark.  I&D Mem. at 10.

Commerce determined that no reasonable alternative to Azerbaijan prices exists because: (a)

neither the IEA nor RERA natural gas prices could be included in the benchmark as "Turkey

does not have a natural gas inflow pipeline connection with Europe," *id.* at 14; (b) the

Department had previously found the Russian market to be distorted, *id.*; and (c) GTIS prices

were inconsistently reported and, thus, "could not be converted to a single unit of measurement

to enable a comparison," *id.* at 15.  As a result, the Azerbaijani price was left as the only

available Tier 2 benchmark upon which the Department could rely.  Accordingly, the

Department imposed a *de minimus* CVD rate for Colakoglu and Icdas and a 1.25% rate for all

others.  Final Results at 16,052.

RTAC challenged the Department's selection of Tier 2 benchmarks in this court and ultimately filed a motion for judgment on the agency record.  Mot. for J. on Agency Record, ECF No. 22 (Oct. 29, 2018).  After several delays related to a lapse in appropriations, the Government filed its response to RTAC's motion, *see* Gov't's Br., and RTAC requested oral argument, Unopposed Mot. for Oral Arg., ECF No. 40 (May 6, 2019).  The court granted RTAC's motion for oral argument, Order, ECF No. 41 (May 9, 2019), and issued questions for the parties to address at the hearing, Letter to Parties, ECF No. 43 (July 2, 2019).  The court conducted that oral argument on July 18, 2019.  ECF No. 44 (July 18, 2019).

## JURISDICTION AND STANDARD OF REVIEW

The court possesses jurisdiction to hear this dispute pursuant to 28 U.S.C. § 1581(c).  The court evaluates Commerce's factual determinations under the substantial evidence standard and reviews the Department's reasoning to determine whether it is in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence "is something less than the weight of the evidence," *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619 (1966), but "is more than a mere scintilla," *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* The Department must supply a reasoned decision, *Atar S.R.L. v. United States*, 730 F.3d 1320, 1325 (Fed. Cir. 2013), and must consider all evidence in the record, including that which fairly detracts from its decision, *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).  Ultimately, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

## DISCUSSION

Upon review of its order finding a countervailable subsidy for the provision of natural gas to Turkish rebar producers, Commerce calculated a CVD rate using only Azerbaijani domestic prices because those prices represent the most reliable world market price on the record with an inflow pipeline connection to Turkey. RTAC challenges that determination as not supported by substantial evidence and not in accordance with law. However, the record supports the Department's findings and the court finds Commerce's treatment of prices on the record to be reasonable. With the benefit of the parties' submissions and counsels' oral presentations before the court, the court sustains the Department's Final Results.

Commerce endeavors to calculate CVD rates under 19 U.S.C. § 1671 through the use of benchmark prices pursuant to 19 C.F.R. § 351.511. That regulation "sets forth three methods . . . in order of preferred approach." *Nucor Corp. v. United States*, 927 F.3d 1243, 1246 (Fed. Cir. 2019). "The first two methods call for inquiry into how the sale prices at issue compare to either of two 'market' prices: either (i) a 'market-determined price' based on actual transactions in the country or (ii) a 'world market price' that would be available to the purchasers in the country." *Id.* (citing 19 C.F.R. § 351.511(a)(2)(i)–(ii)). The first is known as a Tier 1 benchmark; the second is a Tier 2 benchmark, the application of which is at the center of this dispute. When Commerce utilizes a Tier 2 benchmark because "there is no useable market-determined price with which to make the comparison," the Department will "compar[e] the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). Commerce will only move on to a Tier 3 benchmark "[i]f there is no world market price available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(iii).

Here, due to the GOT's participation in the Turkish market for natural gas, Commerce moved on from a Tier 1 benchmark to a Tier 2 benchmark to calculate a CVD rate for Turkish producers of rebar.  The Department has determined that "Turkey has the requisite inflow pipeline connections with only Azerbaijan, Iran, and Russia," I&D Mem. at 12, and "purchasers in Turkey are physically precluded from purchasing certain natural gas on the world market," *id.* at 13–14.  As a result, IEA and RERA prices are not appropriate Tier 2 benchmarks because their source countries lack a pipeline connection capable of transporting natural gas into Turkey. Based on the Department's finding that only those countries with inflow pipeline connections to Turkey would be "available" to purchasers in Turkey and due to the shortcomings accompanying the Russian and Iranian prices, Commerce has used only the Azerbaijani prices.

RTAC does not challenge Commerce's declining to apply a Tier 1 benchmark, but instead contests the Department's Tier 2 calculation.  RTAC presents a challenge to: (a) Commerce's factual findings surrounding Turkish pipeline connections and (b) the Department's application of its benchmark regulations.  Challenging the Turkish pipeline connection findings, RTAC contends that there was not substantial evidence on the record to discard IEA prices as not capable of transport via pipeline into Turkey.  Next, RTAC argues that the Department impermissibly applied its Tier 2 regulations by preferring natural gas prices from countries with an inflow pipeline connection to Turkey in calculating a world market price "available to purchasers" in Turkey.  RTAC's arguments, however, are misguided.  The court upholds the Department's findings regarding the Turkish pipeline as supported by substantial evidence and further holds the selection of Azerbaijani prices to be a lawful exercise of Commerce's discretion under 19 C.F.R. § 351.511(a)(2)(ii).  As a result, the court sustains Commerce's determinations in full.

I.    **Substantial Evidence Supports the Department's Findings Surrounding the Turkish Natural Gas Pipeline Network**

With regard to substantial evidence, "the question here is whether the evidence and reasonable inferences from the record support the [Department's] finding[s] . . . ." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). "Commerce may, based on its experience in administering the statute, make justifiable inferences on the record before it," *Asociacion Colombiana de Exportadores de Flores v. United States*, 23 CIT 148, 153, 40 F. Supp. 2d 466, 472 (1999) (citing *Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B.*, 347 U.S. 17, 50 (1954); *Matsushita*, 750 F.2d at 933), so long as those inferences are supported in the record and logically related to the facts found.

Commerce's reliance on Azerbaijani prices as a Tier 2 benchmark is predicated upon the Department's determination that only those prices originating in a country with an inflow natural gas pipeline connection to Turkey would be reasonably available to purchasers in Turkey. Among those countries with an inflow pipeline connection to Turkey, only Azerbaijan's prices were available and non-distorted. Commerce discarded other prices, including the IEA prices, for lack of a pipeline connection because that feature rendered the domestic natural gas in those countries not "available to purchasers" in Turkey. In support of these factual determinations, Commerce cited information provided by the GOT as well as information contained in the 2015 Annual Report and the BOTAS map. As those documents adequately support Commerce's findings, the court sustains these factual determinations.

RTAC focuses its energy attacking Commerce's implicit finding that the record did not support a determination that there was an inflow pipeline connection from Greece to Turkey as such a connection would have enabled Commerce to utilize the IEA prices. Not only has Commerce supported its findings surrounding the Turkish pipeline with substantial evidence, but

the factual record does not allow for an inference that there is an inflow connection with Greece.

The BOTAS map and the 2015 Annual Report constitute substantial evidence supporting the

Department's finding that the Greece-Turkey connection only supplies natural gas in one

direction.  First, the BOTAS map indicates pipeline flow through arrows which the map legend

labels "GAS EXISTING IMPORTS," "COMPACTED GAS VOLUME," and "EXPORT

VOLUME."  GOT Questionnaire Resp. ex. 6d at 22–23.  And the northwestern portion of the

map utilizes a green arrow to indicate an "EXPORT VOLUME" connection to Greece.  *Id.*

Next, the 2015 Annual Report describes the Turkey-Greece natural gas pipeline as

"developed . . . to transport natural gas . . . to European markets via Turkey and Greece."  *Id.* at

31.  Last, the only relevant import data available on the record contains no information on

imports via pipeline from Greece or any other European country.  Colakoglu Benchmark

Submission at 4.  Taken together, the evidence constitutes substantial evidence indicating that

the pipeline flows from Turkey to Greece, and not *vice versa*.

RTAC would have the court believe that the evidence cited above does not definitively

eliminate the possibility that the pipeline also flows from Greece to Turkey.  However, RTAC's

suggestion remains unmoored from record evidence and calls for a fishing expedition upon

remand.  The court declines to engage in such unsubstantiated conjecture.  Rather, the court sees

the Department's inference as a reasonable one.  An agency is permitted to draw an inference in

consideration of all record evidence that would bolster or rebut that inference.  *See Radio*

*Officers' Union*, 347 U.S. at 56.  What's more, "[a]lthough Commerce has authority to place

documents in the administrative record that it deems relevant, 'the burden of creating an

adequate record lies with [interested parties] and not with Commerce.'"  *QVD Food Co. v.*

*United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).  RTAC presented no evidence—either at

the administrative stage or in front of the court—supporting its desired outcome and so has failed

to meet its burden.  The time to submit information regarding the Turkey-Greece pipeline flow

has passed and the court will not remand a decision that is adequately supported by substantial

evidence.[3]  Here, the record contains no evidence that would counter the inference made by

Commerce.  The evidence in the record clearly establishes inflow pipeline connections with only

Iran, Russia, and Azerbaijan.  The only logical inference to be made, then, is that no other

country, including Greece, has such an inflow connection.

Last, RTAC argues that Commerce "did not address, in explaining its conclusion, the

Greece-Turkey pipeline evidence that tended to undermine its conclusion regarding inflow from

Europe into Turkey . . . ."  Reply Br. of Pl. 6, ECF No. 37 (Apr. 22, 2019).  Specifically, RTAC

claims that the Department did not provide an adequate reason for disregarding the GTIS data

and certain information submitted by Colakoglu.  *Id.*  Likewise, RTAC contends that the

Government's treatment of this evidence amounts to a *post hoc* rationalization for the agency's

decision.  *Id.* at 8.  While RTAC is correct that "a reviewing court . . . must judge the propriety

of [agency] action solely by the grounds invoked," *Burlington Truck Lines*, 371 U.S. at 169, this

court's standard of review requires only that Commerce "take into account whatever in the

record fairly detracts from [the] weight" of its ultimate conclusion, *CS Wind Viet.*, 832 F.3d at

1373.  The Department's considered approach comports with that standard.  First, the GTIS data

---

[3] Likewise, RTAC's suggestion that verification is needed falls flat.  Where substantial evidence adequately supports a factual determination, no verification of those facts is required of the agency.  Further, "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record," *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014), and the court only considers the adequacy of the determination on the record before it.  As a result, RTAC's reference to a prior case in which Commerce did conduct verification of pipeline flow, *Certain Cold-Rolled Steel Flat Prods. from the Russian Fed'n*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirm. CVD determ.), is unavailing.

related to other forms of natural gas not the subject of this review, I&D Mem. at 14–15 (citing

Turkey Rebar Final Determ. II at 8–12, 22 (GTIS data is inconsistently reported and "includes

shipments of compressed natural gas.")), such that Commerce reasonably considered and

discarded those prices.  Second, Colakoglu's submission is not sufficiently probative of pipeline

connections and, thus, does not "fairly detract" from Commerce's findings.  *See* Gov't's Br. at

12–13.  Accordingly, the agency properly took this evidence under consideration and the

Government's argument on appeal does not constitute a *post hoc* rationalization.

Ultimately, Commerce's findings surrounding the Turkish natural gas pipeline are

supported by substantial evidence.  Not only does the record support an inflow connection from

Azerbaijan, but also the lack of such a connection with Greece.  As a result, those findings are

sustained.

## II.  Commerce's Prioritization of Prices from Source Countries with an Inflow Pipeline Connection to Turkey is Reasonable and in Accordance with Law

As to Commerce's determination that it would only consider prices from countries

connected to Turkey via inflow pipeline, that reasoning constitutes a reasonable methodology for

distinguishing amongst prices that may or may not be "available to purchasers in the country in

question," 19 C.F.R. § 351.511(a)(2)(ii).  In light of the considerable discretion afforded to

Commerce's chosen methodology and the soundness of the agency's choice, the court sustains as

lawful the Department's determination that countries without an inflow pipeline connection to

Turkey do not meet the regulatory requirements of a Tier 2 benchmark.

RTAC's challenge of Commerce's methodology amounts to little more than a stated

preference that the Department pursue an alternative course on remand.  This court "is not to

substitute its judgment for that of the agency."  *See State Farm*, 463 U.S. at 43.  In fact, the court

extends to Commerce a measure of discretion in pursuing its methodology in administrative

proceedings.  *See Pesquera Mares Australes, Ltda. v. United States*, 266 F.3d 1372, 1379 (Fed.

Cir. 2001).  To that end, if there are multiple reasonable options at the Department's disposal, the

court is not to question the agency's choice among them.  *See id.*  So long as Commerce has

pursued a reasonable and lawful course of action, its determinations will be upheld.

      Here, the Department's method of calculating a world market price is reasonable.

Commerce chose to prioritize prices from countries connected via pipeline and discarded prices

from countries that lacked a pipeline connection.  That distinction arose out of the Department's

determination that purchasers in Turkey would be "physically precluded" from accessing prices

from countries without a pipeline connection as natural gas can only be transported via pipeline.

While the Department may have pursued a different methodology for determining the

availability of certain prices, the court will only overturn Commerce's determination if it

represents an unlawful choice.  Certainly, Commerce's decision to use only those world market

prices that, in its view, were "reasonable to conclude . . . would be available" in Turkey is a

lawful exercise of its discretion.

      The best RTAC can do is allege that Commerce has treated world market prices

inconsistently by determining their availability in Turkey according to pipeline connections.

According to RTAC, "there is no rational distinction to be made between the Azerbaijani

domestic prices and the other national domestic prices on the record" because each represents

prices for sale only to domestic purchasers.  Pl.'s Br. at 14.  But, as the Government is quick to

point out, the natural gas price used in calculating the CVD rate is not merely an Azerbaijani

domestic price but rather that Azerbaijani price with an adjustment for transportation fees.  The

IEA prices are not similarly susceptible to such a transportation adjustment because (a) this form

of natural gas can only be transported via pipeline and (b) there is no inflow pipeline connection

with Europe.  Ultimately, Commerce's constructed price is reasonable as Azerbaijan is the only

country with available, non-distorted prices that has an inflow pipeline connection to Turkey.

While Commerce's regulations state a preference for conducting an average "to the

extent practicable," 19 C.F.R. § 351.511(a)(2)(ii), the Department is under no obligation to do

so, especially in an instance such as this where the record contains only one suitable world

market price.  Commerce need not conduct an average where the prices to be included are not

consistently reported or otherwise would have a distortive effect.  Moreover, when the

Department reasonably concludes that there is only one price on the record amenable to inclusion

in a Tier 2 calculation, Commerce need not reverse-engineer the availability of certain prices so

as to conduct an average.  Here, the Department is faced with only one price on the record it

views as reliable and available; having found that selection to be supported by substantial

evidence, the court likewise sanctions the calculation using only the Azerbaijani prices as a

lawful expression of agency discretion under 19 C.F.R. § 351.511(a)(2)(ii).

## <u>CONCLUSION</u>

Commerce's decision to calculate a Tier 2 benchmark using only the Azerbaijani prices is

supported by substantial evidence and in accordance with law.  The Department cited sufficient

evidence and made permissible inferences in finding that only certain countries have an inflow

pipeline connection with Turkey.  With those findings in tow, Commerce exercised its discretion

to pursue a lawful methodology that employed use of only those prices available to purchasers in

Turkey via inflow pipeline connection.  Accordingly, the court **SUSTAINS** Commerce's

determinations in full and judgment will enter accordingly.

Dated: August 8, 2019                                          /s/ Richard W. Goldberg
New York, New York                                              Richard W. Goldberg
                                                                              Senior Judge